IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

**ARCHIE M. PARKER,**
    **Plaintiff,**

v.                                          No:   1:05cv145/MMP/MD

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**
    **Defendant.**

_____

**REPORT AND RECOMMENDATION**

    This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Rules 72.1(A), 72.2(D) and 72.3 of the local rules of this court relating to review of administrative determinations under the Social Security Act and related statutes.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying claimant Parker's application for disability insurance benefits under Title II of the Act.

    Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

**PROCEDURAL HISTORY**

    Plaintiff filed an application for disability insurance benefits on January 29, 2002 claiming a disability onset date of November 2, 2001.  Her application was

denied initially and on reconsideration and plaintiff requested a hearing before an Administrative Law Judge (ALJ). A hearing was held on May 11, 2004 at which plaintiff was represented by counsel and testified. A vocational expert also testified. The ALJ rendered an unfavorable decision on January 10, 2005 (Tr. 12-23) and the Appeals Council declined review (Tr. 4-6), making the decision of the ALJ the final decision of the Commissioner, and therefore subject to review in this court. *Falge v. Apfel*, 150 F.3d 1320 (11th Cir. 1998). This appeal followed.

## FINDINGS OF THE ALJ

Relative to the issues raised in this appeal, the ALJ found that plaintiff had severe conditions consisting of hand and neck pain, status post bilateral carpal tunnel release surgery, and degenerative joint disease of the knees and cervical spine but that she did not have an impairment that met or medically equaled any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4; that plaintiff's allegations regarding her limitations were not totally credible; that plaintiff retained residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently and to sit and stand for up to six hours in an eight hour workday, to use her hands and arms 50% of the time for handling, fingering and grasping and therefore had the residual functional capacity to perform a limited range of light work; that when she applied she was a younger individual but at the time of the ALJ's decision was closely approaching advanced age, had a limited education and no transferrable skills; that she was unable to perform any of her past relevant work; that although her limitations did not allow her to perform a full range of light work, there were a significant number of jobs in the national economy that she could perform, such as food worker processor, surveillance system monitor, coin machine collector, and ticket seller; and that she was not under a disability as defined in the Act.

## STANDARD OF REVIEW

The ALJ's decision will be reversed only if it is not supported by substantial evidence. *Falge, supra*. The court must determine whether the Commissioner's decision is supported by substantial evidence in the record and whether it is premised upon correct legal principles. *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983). In determining whether substantial evidence exists, the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)(citations omitted). Findings of fact by the Commissioner that are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(f), the Commissioner analyzes a claim in five steps. A finding of disability or no disability at any step renders further evaluation unnecessary. The steps are:

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairment?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4. Does the individual have any impairments which prevent past relevant work?

5. Do the individual's impairments prevent any other work?

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step 5 to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. *Chester v. Bowen*, supra, 792 F.2d at 131; *MacGregor v. Bowen*, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, claimant must prove that she cannot perform the work suggested by the Commissioner. *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

## PLAINTIFF'S MEDICAL HISTORY

Plaintiff, who was a school custodial worker, began experiencing numbness in her hands in March 1998 (Tr. 198). Later that year she consulted with Thomas Wright, M.D., an orthopedic surgeon, at the Shands Healthcare Center. Dr. Wright performed carpal tunnel syndrome (CTS) release on plaintiff's left hand in November 1998 (Tr. 123) and continued to see her at least through February of 2002 (Tr. 98). Plaintiff did not recover quickly, and Dr. Wright ordered nerve conduction studies which were performed in April 1999 and read as normal (Tr. 119). Plaintiff's condition did not improve further, and July 22, 1999 Dr. Wright indicated that she had reached maximum medical improvement with a three percent impairment (Tr.

118). Plaintiff continued to complain of pain, especially in her left hand, and approximately a year later, in August 2000, another nerve conduction study was performed which showed bilateral medial nerve entrapment (Tr. 112). Plaintiff was given an injection in her right hand which afforded no relief (*id.*). In February 2001 Dr. Wright released plaintiff to light duty, lifting no more than five pounds and working up to 25 hours a week (Tr. 109). Plaintiff still did not improve and on January 3, 2002, Dr. Wright indicated that plaintiff would remain on temporary total disability until she was seen by a pain management specialist. He increased her disability to six percent (Tr. 99). Dr. Wright last saw the plaintiff on February 7, 2002. He noted that she had been to pain management and they had prescribed Mobic but no muscle relaxers and had not done any nerve blocks. On physical examination she had full range of motion with tenderness along the carpal canal with positive Tinel's sign, and over five muscle strength. She stated that her pain was intense to the point that she was in tears and was taking an antidepressant. Dr. Wright felt that he had nothing further to offer her and told her to follow up at the pain clinic (Tr. 98). Interestingly, the administrative record does not contain any records from the pain management clinic, so it is unclear whether plaintiff ever returned.

Later, in July 2002, plaintiff was seen by Rodger Powell, M.D., a hand surgeon who performed CTS release on plaintiff's right hand on August 23, 2002 (Tr. 143). Dr. Powell removed plaintiff's sutures on September 6, 2002 at which time plaintiff reported that sensation was returning to her hand (Tr. 170). There is no record that plaintiff saw Dr. Powell thereafter.

On November 19, 2002, plaintiff was seen by Oscar DePaz, M.D., a rehabilitation specialist. Dr. DePaz treated plaintiff from that time until shortly before the hearing, April 21, 2004. Plaintiff complained of severe pain and at one time Dr. DePaz tried her on Methadone (Tr. 245), to which she reacted, so that trial was discontinued (Tr. 244). She was begun on Darvocet on May 1, 2003 (Tr. 240) but she

did not show any improvement.  At this time, plaintiff was complaining of problems with both hands, chronic neck pain, depression, and insomnia (Tr. 230-239).  Dr. DePaz scheduled another nerve conduction study which was performed July 7, 2003.  In his records Dr. DePaz noted that a prior nerve conduction study done on March 22, 2003 showed moderate median nerve entrapment across the right wrist and possible ulnar nerve entrapment across the right elbow.  The nerve conduction study conducted on July 7, 2003, however, was entirely normal with no electrophysiological evidence of compression neuropathy for the median or ulnar nerves at the wrist or elbow.  Induction velocity, amplitude of evoked potential, and sensory distal latencies were well within normal limits (Tr. 236-237).  Dr. DePaz concluded that plaintiff should return to Dr. Powell's clinic for further care (Tr. 236-237).

It does not appear that plaintiff returned to Dr. Powell but continued to see Dr. DePaz.  On September 24, 2003, she indicated that Darvocet was providing some relief (Tr. 234).  On December 2, 2003 she indicated that Klonopin, which had also been prescribed, was working pretty well (Tr. 230).  The last medical record on plaintiff was a visit to Dr. DePaz on April 21, 2004 at which she indicated that she had become quite frustrated regarding her ongoing pain.  She noted that Klonopin helped somewhat but had been less effective recently.  On July 12, 2003 Dr. DePaz restated the normal findings from the July 7, 2003 nerve conduction study, and suggested that plaintiff's problems were possibly from fibromyalgia (Tr. 298).

In addition to her orthopedic hand specialist, plaintiff had an ongoing treatment relationship with Steven Jones, M.D., an internist.  Plaintiff first saw Dr. Jones in February 2000 with miscellaneous unrelated complaints, and she continued under his care at least until February 2004.  Dr. Jones saw plaintiff for routine physical problems but he also recorded her complaints of pain regarding her neck, knees and hands.  In his last office note he reported that he thought plaintiff was

disabled; that she had difficulty walking due to pain in her lower extremities; that her CTS persisted; but her physical examination was not remarkable and there was normal curvature of the spine with no significant muscular atrophy or weakness. Dr. Jones indicated that he thought plaintiff's symptoms, including her CTS would improve if she could successfully lose weight (Tr. 281-282). Earlier, Dr. Jones had filled out a form presented to him by the state agency in which he indicated that he felt plaintiff had a mental impairment that significantly interfered with her daily functioning (Tr. 168).

There is also one recorded visit by plaintiff to Edward Jaffe, M.D., an orthopedist in partnership with Dr. Powell. Dr. Jaffe was concerned about plaintiff's knees. He noted that she walked with a slight limp on the right and there was mild varus alignment of the right knee but no swelling. The knee was stable, there was tenderness to palpation at the medial joint line, and x-rays indicated moderately advanced right knee degenerative joint disease with loss of articular cartilage height with osteophytes. Dr. Jaffe suggested a trial of Bextra, Glucosamine, efforts at weight loss, and use of a cane (Tr. 171-172). It does not appear that plaintiff saw Dr. Jaffe thereafter.

The state agency referred plaintiff to two specialists for evaluation. She was seen on November 26, 2002 by Louis Legum, Ph.D., a psychologist. Plaintiff reported a history that she felt progressive pain in her hands and neck and an inability to function. She could dress herself most of the time but needed help with zippers; found it difficult to get in and out of a bathtub; needed help with cleaning, cooking and laundry; could go to the grocery store, and spent a lot of time on the couch. She also reported sleeping very little and not feeling rested. She had difficulty remembering things and was lethargic and had no interests. On examination she appeared to be of average intelligence, of articulate speech. Her affect was blunt and her mood was dysphoric to neutral but there was no

hallucinatory or delusional thinking. Her memory appeared to be intact but her judgment and insight were poor. Dr. Legum stated that plaintiff indicated ongoing depression related to her physical problems but that she had not aggressively pursued treatment. Dr. Legum diagnosed mood disorder due to a general medical condition and pain disorder with both psychological factors and a general medical condition. He assigned a GAF score of 45-50 (Tr. 201-203).

Plaintiff was also referred to Robert A. Greenberg, M.D., a pulmonologist, for physical evaluation. Dr. Greenberg reported a medical history consistent with the foregoing and on physical examination found decreased range of motion in the cervical spine and right knee but full range of motion in all other joints. There was decreased grip strength and arm strength bilaterally, measuring 4/5 as well as decreased right leg strength, again measuring 4/5. There were no other motor, sensory or reflex abnormalities noted. Plaintiff walked with a right leg limp but did not require any assistive device. There was no evidence of active inflammatory arthritis. Fine manipulation of her hands were normal. Dr. Greenberg's impression was bilateral carpal tunnel syndrome and probable osteoarthritis of the shoulder and spine and right knee, aggravated by obesity. Based on his medical findings he felt that plaintiff would be unable to perform work-related activities that required heavy lifting or repetitive use of her hands (Tr. 218-219).

On December 13, 2002, a non-examining consulting physician filled out a Psychiatric Review Technique Form (PRTF). The consultant, Gary Buffone, Ph.D., a psychologist, opined based on his review of the medical record that plaintiff had a medically determinable impairment consisting of mood disorder due to her general medical condition; and that her limitations based on these findings were mild with respect to restrictions of activities of daily living, difficulties in maintaining social functioning and difficulties in maintaining concentration persistence or pace, and that she had no episodes of decompensation. Dr. Buffone concluded that plaintiff's

**mental condition was not severe (Tr. 204-217).**

## DISCUSSION

The plaintiff argues that the ALJ erred (1) in failing to attach a psychiatric review technique form to his decision, (2) in failing to give appropriate weight to treating, examining and consulting physicians, (3) in determining plaintiff's residual functional capacity, (4) in establishing that there is work in the national economy that plaintiff can perform, and (5) in miscategorizing crucial evidence, and that plaintiff was disabled from her onset date as a matter of law. The Commissioner argues that the ALJ's findings were supported by substantial evidence and must, therefore, be sustained. The issue thus presented is whether the ALJ's decision that the plaintiff was not disabled, in light of her physical and mental condition, age, education, work experience, and residual functional capacity, is supported by substantial evidence in the record.

    1.    <u>Psychiatric review technique form.</u>

Plaintiff's first ground for relief relates to the Commissioner's psychiatric review technique form (PRTF). She contends that it was reversible error for the ALJ to fail to attach a copy of a PRTF to his opinion. However, as the Commissioner correctly poins out, the requirement that the PRTF be attached to the decision was discontinued by the Commissioner's regulations effective September 20, 2000.

Prior to 2000 the regulations required the ALJ to *fill out* a PRTF, 20 C.F.R. § 404.1520a(d)(1) (1999), and append it to his decision, *Montgomery v. Shalala*, 30 F.3d 98 (8th Cir. 1994). The revised regulations omit that language, requiring instead that the ALJ "document application of the technique in the decision." 20 C.F.R. § 404.1520a(e) (2005); accord, *Moore v. Barnhart*, 405 F.3d 1208 (11th Cir. 2005) ("We thus join out sister circuits in holding that where a claimant has presented a colorable claim of mental impairment, the social security regulations require the ALJ

to complete a PRTF, append it to the decision, *or incorporate its mode of analysis into his findings and conclusions*.") (emphasis added).

Here the ALJ made specific reference to the technique, incorporated into his decision the PRTF filled out by a consulting psychologist, and found that "the claimant's mental impairment results in mild restrictions of activities of daily living, mild difficulties maintaining social functioning, mild difficulties maintaining concentration, persistence or pace, and no episodes of decompressiom." (Tr. 16, 204-217). Nothing further was required.

2.  Physicians' opinions.

Plaintiff next contends that the ALJ erred in discounting the opinions of several physicians, both treating, examining and consulting, and that she is therefore entitled to reversal. The amount of weight to be given to various medical sources is well established. Absent good cause, the opinion of a claimant's treating physician must be accorded considerable or substantial weight by the Commissioner. *Stewart, supra; Lewis, supra.; Broughton v. Heckler*, 776 F.2d 960, 960-961 (11th Cir. 1985); *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986). Generally, a treating physician's medical opinion is entitled to greater weight than the opinion of a consulting physician. *Wilson v. Heckler*, 734 F.2d 513, 516 (11th Cir. 1984). In *MacGregor v. Bowen*, 786 F.2d 1050 (11th Cir. 1986), the Eleventh Circuit ruled:

> The [Commissioner] must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error. . . . Where the [Commissioner] has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true.

786 F.2d at 1053. The opinion of a nonexamining physician is entitled to little weight, and, if contrary to the opinion of a treating physician, is not good cause for disregarding the opinion of the treating physician. *Broughton v. Heckler*, 776 F.2d

960, 962 (11th Cir. 1985). However, a brief and conclusory statement that is not supported by medical findings, even if made by a treating physician, is not persuasive evidence of disability. *Warncke v. Harris*, 619 F.2d 412, 417 (5th Cir. 1980); *Johns v. Bowen*, 821 F.2d 551, 555 (11th Cir. 1987). *Compare, Wilson v. Heckler, supra*.

Numerous medical sources treated or consulted on plaintiff's various physical and mental conditions, so for convenience the court will discuss those sources as to each of plaintiff's severe conditions.

A. <u>Knees</u>.

The ALJ found that plaintiff had severe degenerative joint disease of the knees (Tr. 17). He also found that plaintiff could do light work (as will be discussed more fully below) and could sit and stand for up to six hours in an eight hour day (Tr. 18). Plaintiff says that this latter finding was unsupported. She notes that Dr. Jaffe opined that plaintiff suffered from degenerative joint disease in her right knee, and prescribed Bextra, glucosamine, weight loss, and use of a cane. Dr. Jaffe did not state any restrictions on plaintiff's activities, however. He simply told her to return if her condition did not improve. She did not return.

Dr. Jones also made notes concerning plaintiff's knee pain, and Dr. Greenberg noted that plaintiff complained of constant pain, stiffness and swelling with decreased range of motion in the knee (Tr. 218-219). He also noted that plaintiff walked with a right limp, but did not need an assistive device (*id*.). His assessment was probable osteoarthritis in the spine and right knee, aggravated by obesity. His only restriction was to heavy lifting or repetitive use of the hands (*id*.). Also, Dr. Lipnick (Dr. DePaz' clinic associate) noted "some exaggeration" in plaintiff's subjective complaints of pain (Tr. 179). Nevertheless, none of these physicians put any specific restrictions on plaintiff's ability to walk or stand.

This evidence certainly supports a finding of severe with respect to plaintiff's

knee, as the ALJ found, but it does not direct anything more. The flaw in plaintiff's argument is her statement that the ALJ found she "could stand for 6 hours out of an eight hour workday . . . ." (Doc. 18, p. 18). That is not what the ALJ found. He determined that plaintiff could *sit and stand* for that period, and perform a limited range of light work, the limitations being related to repetitive use of her hands (Tr. 18).

> The Commissioner's rules define "light work" in part:
>
> **Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.**

20 C.F.R. § 404.1567(b). The vocational expert identified several jobs in the light and sedentary categories that plaintiff could perform, including surveillance system monitor (DOT 379.367-010) (sedentary work), ticket seller (DOT 211.467-030) (light work), and photographic processor (DOT 976.685-038) (light work). None require standing full time. The ALJ's determination concerning plaintiff's knee limitations were supported by substantial record evidence, and she is not entitled to reversal on this ground.

    B.    <u>Carpal Tunnel Syndrome.</u>

Plaintiff also contends that the ALJ improperly discounted the various medical source opinions concerning her CTS. Plaintiff undoubtedly has problems with her wrists and hands, and the ALJ took that into account in limiting her residual functional capacity to 50% use of her hands and arms (Tr. 18). Although plaintiff argues that she continued to complain of subjective pain in her wrists and hands,

the treating physicians were not so definite.  Dr. Wright, who performed the CTS release on plaintiff's left hand, released her to light duty in October 1998 (Tr. 263).  He later indicated she would be on temporary total disability until she could be seen in the pain clinic, and rated her at only 6% disabled (Tr. 99).

Dr. Russell performed CTS release on plaintiff's right hand, and Dr. DePaz on follow-up noted that her electrodiagnostic studies were normal , and that plaintiff could continue on light activity (Tr. 178).  Neither Dr. Powell nor Dr. DePaz ever opined that plaintiff was so limited in her activity as to render her significantly restricted.  Finally, the only restriction placed on plaintiff by Dr. Greenberg was that she avoid heavy lifting and repetitive use of her hands (Tr. 219).  The residual functional capacity assigned by the ALJ was consistent with all these opinions.

While Dr. Jones opined that plaintiff was "disabled," such an opinion is not binding on the Commissioner.  The opinion by a treating physician that a patient is "unable to work" or is "disabled" is not dispositive for purposes of Social Security claims. The Commissioner's regulations and the interpretations of those regulations clearly provide that an ALJ should give weight to a physician's opinions concerning the nature and severity of a claimant's impairments, but that the ultimate question of whether there is disability or inability to work is reserved to the Commissioner.  For instance, Title 20 C.F.R. § 404.1527(e)(1) specifically states that a finding of disability or inability to work by a medical source does not mean that the Commissioner will automatically reach the same conclusion.  See also Title 20 C.F.R. § 416.927(e).  Furthermore, the Commissioner "will not give any special significance to the source" of an opinion on issues reserved for the Commissioner. Title 20 C.F.R. § 404.1527(e)(3) and § 416.927(e)(3);  *see also* Social Security Ruling 96-5p (whether an individual is disabled is a question reserved to the Commissioner; treating source opinions on such questions are "never entitled to controlling weight or special significance").  Although such opinions on disability are not entitled to

controlling weight, they must not be ignored, and the Commissioner must examine the entire record to determine whether such opinions are supported by the record. SSR 96-5p. In *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997) the court reversed the ALJ's finding of no disability, in part because the ALJ relied on a treating physician's report that the claimant could no longer work as a longshoreman when this report was ambiguous as to whether the claimant could do *any* work, and the physician subsequently wrote a letter saying the claimant was completely disabled.

To require the Commissioner to accept as controlling a statement that a patient is or is not disabled would require the Commissioner to credit the physician not only with knowledge of the patient's physical condition, but also with an understanding of the nuances of how the regulations analyze physical limitations with respect to job experience, age, education, transferability of skills, the definitions of the various levels of exertion relevant to types of work, and similar matters. Moreover, a physician's opinion on whether a person is able to work may be colored by such things as the physician's knowledge of local hiring practices, whether there are specific job vacancies, a person's reluctance to do a particular kind of work, and similar matters. These things are not properly considered by the Commissioner in determining disability. Title 20 C.F.R. §§ 404.1566, 416.966. For all these reasons, a physician's opinion that his or her patient cannot work or is disabled is not a conclusive medical opinion for the purpose of Social Security benefits determinations and by itself is not entitled to special significance.

C.   <u>Mental condition</u>.

Plaintiff also contends that the ALJ ignored her problems with depression. Dr. Jones filled out a form in which he opined that plaintiff's depression was disabling, but, as the ALJ noted, Dr. Jones was an internist, not a mental health practitioner, and his opinion was properly discounted. The Commissioner's

regulations provide that he gives "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5). Dr. Legum's mental examination was largely unremarkable, yet he found that plaintiff had a Global Assessment of Functioning Scale (GAF) score of 45-50. The ALJ found this to be inconsistent with the remainder of Dr. Legum's examination and with the medical evidence generally. He noted that the *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Ed. defined a GAF score of 40 to 50 as describing a person "with 'serious symptoms, (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)'." (Tr. 20). The ALJ also noted that according to Dr. Legum plaintiff had essentially normal mental findings with the exception of poor judgment and insight. The ALJ therefore found that the latter finding, rather than the GAF score, was more consistent with the record as a whole, and that the plaintiff's emotional problem did not significantly limit her from performing a light job (*id.*).

The record as a whole supports the ALJ's decision. There is no question that plaintiff showed signs of depression, and was given medication for the condition, but her depression was caused by her perceived inability to recover from her surgeries. Nowhere is there any indication that she was so depressed as to be unable to function in the economy, and indeed her daily activities of doing housework and shopping were inconsistent with a mentally disabling condition. The ALJ did not err in discounting either Dr. Jones' opinion or Dr. Greenberg's GAF score, and plaintiff is not entitled to reversal on this ground.

3. <u>Residual functional capacity.</u>

Plaintiff next contends that the ALJ erred in determining her residual functional capacity. She says that the ALJ depended solely on the opinions of non-examining physicians in reaching his conclusion that plaintiff could perform limited

light work. Her argument totally ignores Dr. Greenberg, an examining physician, whose only limitation was that plaintiff should not do heavy lifting or use her hands repetitively. That is consistent with the restricted light work (use of hands and arms only 50% of the time) that the ALJ found to be appropriate. It is also consistent with normal findings on nerve conduction studies. Consequently, it is clear that the ALJ did not rely on the non-examining physicians exclusively. The medical record as a whole supported his finding, and plaintiff is not entitled to reversal on this ground.

### 4. Plaintiff's ability to work.

Plaintiff next contends that the ALJ posed an incomplete hypothetical question to the vocational expert, and that his findings concerning plaintiff's ability to do work that existed in the national economy was flawed. A hypothetical question must comprehensively describe the plaintiff's condition, and vocational expert testimony that does not accurately address that condition cannot be considered substantial record evidence. *Pendley v. Heckler,* 767 F.2d 1561, 1563 (11th Cir. 1985). However, the hypothetical need not include every impairment a plaintiff claims, only those that the ALJ ultimately found. Plaintiff argues that the ALJ's finding that plaintiff could use her hands and arms "half the time" is unsupported in the record, but that attempts to split the hair too finely. Dr. Greenberg opined that plaintiff should not use her hands repetitively. While that term lacks precision, it implies a significant amount of hand movement, and it does not mean that plaintiff could not use her hands. Moreover, the totally normal nerve conduction study in July 2003 does not support significant restrictions. There was substantial record evidence to support the ALJ's finding based on his hypothetical question, and plaintiff is not entitled to reversal on this ground.

### 5. Medical evidence.

Finally, plaintiff says that the ALJ erred in referring to muscle spasm as a

subjective complaint rather than an objective sign.  In actuality this did not occur in the ALJ's decision, but during counsel's closing remarks at the hearing.  Counsel was referring to plaintiff's neck problems, and referred to her muscular spasm and rigidity.  The ALJ interrupted, and said that muscle spasm was a subjective complaint, meaning that when the doctor refers to such things he is referring to what the patient relates.  By itself, it may be true that a muscle spasm is an objective finding, but the ALJ seemed to be referring not to what a doctor found, but to what the patient related.  In either event, plaintiff points to nothing in the ALJ's decision where he adopted such a finding, or used it to discount either a physician's opinion of a specific limitation.  Beyond speculating that this may have led the ALJ to find that plaintiff's neck condition was not severe, the plaintiff offers nothing of substance.

## CONCLUSION

The ALJ did not err in finding that plaintiff was not disabled as defined in the Act.  Accordingly, it is respectfully RECOMMENDED that the decision of the Commissioner be AFFIRMED, that this action be DISMISSED and that the clerk be directed to close the file.

At Pensacola, Florida this 13th day of June, 2006.

/s/ *Miles Davis*
**MILES DAVIS
UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  See 28 U.S.C. § 636;** *United States v. Roberts***, 858 F.2d 698, 701 (11th Cir. 1988).**

*Case No: 1:05cv146/MMP/MD*